DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**RONALD SMITH,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D12-3636

[January 6, 2016]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jeffrey R. Levenson, Judge; L.T. Case No. 06-2007023026CF10A.

Carey Haughwout, Public Defender, and Peggy Natale, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Nancy Jack, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals his conviction and sentence for first degree murder with a deadly weapon. He raises four issues. We find no merit in any of them and affirm. We write only to address the hearsay issue raised.

The grand jury indicted the defendant for first degree murder with a deadly weapon. The first trial resulted in a mistrial. The second trial resulted in the defendant's conviction.

The evidence established that the defendant and victim lived together from 2002 until her death in December 2007. In November 2007, the defendant fired a gun at the victim. The victim's neighbor confirmed the shooting and that she also heard the defendant say he was going to kill the victim. The defendant was arrested for domestic violence for this incident, but the victim waived prosecution.

The next month, and two days before the murder, the victim called her daughter and told her that she and the defendant had been in an

argument. The defendant had moved the victim's car and kept her car keys so she could not leave. The police arrived, but no one was arrested for this incident.

The next day, the daughter learned about a knife incident where the neighbor overheard the victim tell the defendant to take a knife away from her throat. The daughter took the victim to get a restraining order. As far as she knew, the victim filled out the paperwork.

The victim stayed with the daughter that night, but spent most of the evening on the phone with the defendant, who called her fifty-six times from 10:00 p.m. to 6:30 a.m. The defendant was angry and accused the daughter and her boyfriend of lying about the victim being at their house. He believed the victim was with another man.

The next morning, the victim left the daughter's house for work at 6:00 a.m. The victim's boss called the daughter around 8:00 or 9:00 a.m., and told her that the victim did not arrive at work. The daughter drove by the victim's house, saw the defendant's truck parked on the lawn, but did not see the victim's car. She assumed the victim and the defendant were together somewhere and kept driving.

The daughter then received a call from the neighbor. As a result, she called her aunt, who agreed to look for the victim's car. The daughter returned to the victim's house with her boyfriend. When she got to the front door, she saw speckles of blood around the door handle and a sheet hung over the front door. She called 911.

She tried gaining entry into the home, but could not. The neighbor came out and the aunt arrived. The aunt told the daughter that she had just gotten off the phone with the defendant, who told her that he hurt the victim. He told her "it's serious this time," and he had to turn himself in.

The daughter called 911 a second time and told the operator exactly what the defendant had said to the aunt. Then, the aunt called 911 and requested help. The daughter's second 911 call is the subject of the hearsay issue raised by the defendant. When the police arrived, the daughter told them she thought the victim was dead inside the house.

The neighbor testified that prior to the daughter's arrival that morning, the victim came home in her work uniform. The victim and the defendant went inside their home. About fifteen minutes later, the defendant left the house and drove away in the victim's car. The neighbor knocked on their front door and every window of the house, but the victim did not answer.

2

She felt something was not right.  She never saw the victim alive again.

The defendant called the neighbor and said he had done something bad.  When the neighbor asked if he killed his wife, he hung up the phone.  He called her back and said he was going to wait at Church's Chicken on Broward Boulevard.  The neighbor told the daughter about the call.  Thirty minutes later, the defendant called the neighbor back and admitted he killed the victim by stabbing her.

A sergeant directed the SWAT team to enter the house around noon.  He found the victim dead in the kitchen; she had been stabbed to death.  The police found two cut phone lines.  The defendant called another detective to turn himself in.  The detective met the defendant at Church's Chicken and arrested him.  The defendant told the detective he had been up for four days.  The defendant stated, "Man, my baby dead."  The defendant admitted his involvement in the victim's death.

The victim had black and blue eyes and five other injuries from a knife—four wounds in the front and one in the back.  The victim had no defensive wounds.  The medical examiner concluded the cause of death was multiple stab wounds and the manner of death was a homicide.

The defendant testified that he and the victim had been in a relationship since 1978.  According to him, the victim sometimes acted aggressively and would "go off in space," not acting like herself.  Other times she was suicidal.  The victim had psychotic episodes and her family or the police would take her away for treatment.  She would get better and then return home.

He admitted to using crack cocaine from October through December 2007.  He did not know if the victim used crack cocaine and he never used it with her.  They had previously used powder cocaine together in the beginning of their relationship.  Drug use affected their relationship and he was trying to seek help through drug rehab.

The defendant admitted to the domestic violence incident and his arrest the month before the victim's death.  He told the police that the victim had approached him aggressively and he pushed her back, but denied having discharged a gun.  He also denied putting a knife to the victim's throat, contrary to the neighbor's testimony.

He recalled the incident where he moved the victim's car.  He testified that the victim had just returned from being Baker Acted and he took her car keys because he and the daughter agreed the victim should not drive.

3

On one occasion, after the victim had slept at the daughter's house, the victim slashed his truck's tires and came at him with a knife. He shut the door and locked her out.

On the morning of the victim's death, the victim came by their house before work to talk to him about drug treatment. They went into the house and the defendant went to use the restroom. On his way to the kitchen, he noticed the keys to the house were not in the door.

The victim was worried that if she went to treatment she might lose her job. The defendant told her that if she did not get treatment, he would not come back to her. According to the defendant, the victim "lost it" and came at him with a knife. He tried to disarm her, and they tussled with the knife. He grabbed the handle of the knife and jabbed it back on her head trying to get her to drop it; the handle hit the victim.

He retrieved the knife from her and asked for the keys. The victim lunged at him and out of instinct he stabbed her in the back in self-defense. When he found the victim unresponsive, he walked around the house, then left. He did not call the police or the paramedics because he was afraid the police would not believe him because he was a four-time ex-felon. He admitted to serving prison time for two counts of attempted murder. He did not find out that the victim tried to get a restraining order against him until about one month after the incident.

The jury found the defendant guilty of first degree murder with a deadly weapon. The court sentenced the defendant to life imprisonment without parole. From his conviction and sentence, the defendant now appeals.

The issue we address is the admissibility of two statements. The first is the daughter's statement, made during her second call to 911, on the morning of the murder. On that 911 tape, the daughter told the dispatcher that the defendant had told the aunt "it was serious this time" and he's going to "turn himself in." The second is the aunt's statement to the daughter about what the defendant had told the aunt.

The daughter's statement on the 911 tape was the subject of a pre-trial hearing where defense counsel sought to have the recording excluded as double hearsay. At that same hearing, the State played a tape of the aunt calling 911 immediately after the daughter called 911 for the second time. During the aunt's 911 call, she identified herself as the victim's sister-in-law. She repeated multiple times, "Could you please get somebody."

The trial court concluded that the aunt's statement to the daughter,

about what the defendant had told the aunt, was an excited utterance because the aunt's statements were all made around the same time and the aunt was under the stress and excitement of the defendant's admission to her and the event. The court also found it could hear the inflections in the aunt's voice during the aunt's 911 call. The defendant's statements to the aunt were admissions.

At the same pre-trial hearing, the aunt admitted she arrived at the house before the victim's body was discovered. But, she denied seeing blood on the front door, denied seeing a sheet over the front door, and denied that the defendant called her while she was with the daughter at the front door. She even denied calling 911. The State played the daughter's and the aunt's 911 tapes to impeach her.

The aunt then admitted she was in front of the house when the daughter made her first 911 call. She again denied that the defendant called her while she was with the daughter. The aunt confirmed it was her voice on the 911 tape, but she did not remember making the call. She claimed that the only reason she called 911 was because the daughter was hysterical. She later admitted the defendant called her and told her "it's bad this time."

The defendant argues the trial court abused its discretion in admitting the daughter's statement during her second 911 call where she relayed the information from her aunt regarding the aunt's conversation with the defendant. He argues the statement was inadmissible double hearsay because the aunt's statement to the daughter was not an excited utterance.

The State responds that because the 911 recording is not included in the record, there is an inadequate record to review the issue. We disagree.

On the merits, the State argues the aunt's statement to the daughter about what the defendant told her was admissible as an excited utterance, which was established by the recording of the aunt's phone call to 911. During that call, it was apparent the aunt was under the influence of a startling event. Alternatively, the State argues the aunt's statement was admissible as a spontaneous statement. Lastly, the State argues that if the admission of the daughter's statement was error, the error was harmless because it was cumulative of other evidence as the defendant admitted to multiple persons he was involved in the victim's death.

"The standard of review for admissibility of evidence is abuse of discretion, limited by the rules of evidence. [W]hether evidence falls within

the statutory definition of hearsay is a matter of law, subject to *de novo* review." *Browne v. State*, 132 So. 3d 312, 316 (Fla. 4th DCA 2014) (alteration in original) (quoting *Lucas v. State*, 67 So. 3d 332, 335 (Fla. 4th DCA 2011)). "Thus, 'whether evidence is admissible in evidence under an exception to the hearsay rule is a question of law . . . [subject to] the de novo standard of review.'" *Id.* (alteration and omission in original) (quoting *Powell v. State*, 99 So. 3d 570, 573 (Fla. 1st DCA 2012)).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2012). "Except as provided by statute, hearsay evidence is inadmissible." *Id.* § 90.802.

"An excited utterance, or '[a] statement . . . relating to a startling event or condition made while the declarant [is] under the stress of excitement caused by the event or condition,' is a hearsay exception." *Thomas v. State*, 125 So. 3d 928, 929 (Fla. 4th DCA 2013) (alterations and omission in original) (quoting § 90.803(2), Fla. Stat. (2008)). There are three requirements for a statement to qualify as an excited utterance: "'(1) there must have been an event startling enough to cause nervous excitement; (2) the statement must have been made before there was time to contrive or misrepresent; and (3) the statement must have been made while the person was under the stress of excitement caused by the startling event.'" *Id.* at 929–30 (citation omitted).

Here, the startling event which caused the aunt's nervousness or excitement was the suspicion that the victim was hurt and/or dead inside the home. This startling event was evidenced by the aunt's statements on her 911 call that she saw blood on the door, that her sister-in-law was hurt inside the house, and her repeated request for help. The startling event was further corroborated by the daughter's 911 calls, which were made directly before the aunt's call.

Because the aunt's statement to the daughter about what the defendant told her was made immediately before the aunt called 911, it was made before there was any time to contrive or misrepresent the facts. This is evidenced by the 911 tapes themselves and the order in which dispatch received the calls.

The aunt's statement to the daughter was made while she was under the stress and excitement of the event. The trial court found the aunt's stress was apparent by the inflection in her voice during her 911 call. The transcript of the aunt's 911 call sufficiently shows she was excited as she kept pleading with the dispatcher to send help.

6

The defendant highlights the aunt's testimony where she denied making the statement to the daughter. However, the record reflects the aunt was not a credible witness because she testified inconsistent with the content in the 911 tapes, most likely because the defendant is her brother.

Because the aunt's statement to the daughter was: (1) made under the stress and excitement of the suspected death of the victim; (2) after the defendant called the aunt admitting his involvement with the victim's death; and (3) was made close to the startling event, the trial court correctly determined it was admissible as an excited utterance. *See Barron v. State*, 990 So. 2d 1098, 1101 (Fla. 3d DCA 2007). We therefore affirm.

*Affirmed.*

GROSS and CONNER, JJ., concur.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***